102 N.J. Super. 512 (1968)
246 A.2d 178
THE CITY OF EAST ORANGE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
TOWNSHIP OF LIVINGSTON, TOWNSHIP OF MILLBURN, BOROUGH OF FLORHAM PARK, MORRIS COUNTY, AND ESSEX COUNTY BOARD OF TAXATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided August 1, 1968.
*517 Mr. Jack Okin, for plaintiff City of East Orange.
Mr. Louis Bort, for defendant Township of Livingston.
Mr. Harold M. Kain, for defendant Township of Millburn.
Mr. Robert Muir, Jr., for defendant Borough of Florham Park (Messrs. Mills, Doyle & Muir, attorneys).
Mr. Charles H. Landesman, Deputy Attorney General, for defendant Essex County Board of Taxation (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
HANDLER, J.S.C.
This is an action in lieu of prerogative writs brought by the City of East Orange against the Township of Livingston, Township of Millburn, Borough of Florham Park and the Essex County Board of Taxation. By its complaint plaintiff (hereinafter referred to as East *518 Orange) seeks a judgment directing that defendant municipalities assess approximately 2,500 acres of property owned by East Orange and located within their borders generally known as the East Orange Water Reserve, as farmland pursuant to the Farmland Assessment Act of 1964, L. 1964, c. 48, N.J.S.A. 54:4-23.1 et seq. East Orange alleges that its Water Reserve has been actively devoted to agricultural use and that it submitted timely applications for its assessment as farmland to the assessors of the Townships of Livingston and Millburn (hereinafter referred to as Livingston and Millburn), which were rejected. In a second count it is alleged that the lands constituting the East Orange Water Reserve have been the subject of continuous tax appeals commencing with the tax year 1957, and that because of the uncertainty as to the outcome of these proceedings public projects, the implementation of a bond issue and budgetary planning concerning the use of these lands for recreational and educational purposes involving East Orange, Livingston and Millburn have been "materially affected." As a result, East Orange seeks a judgment directing that defendant municipalities assess all eligible lands within the East Orange Water Reserve as farmlands pursuant to N.J.S.A. 54:4-23.1 et seq., and to exempt from taxation all of these lands "used for recreational and educational purposes."
Defendant municipalities in general contend that the East Orange Water Reserve is used principally for the purpose and protection of a public water supply and deny that any portion thereof is entitled to be taxed specially under the Farmland Assessment Act of 1964, or that any of the property is entitled to exemption for recreational or educational uses. They further contend that the court is without jurisdiction because plaintiff has failed to exhaust its administrative remedies, and any judgment rendered by the court would constitute an advisory opinion or adjudication. Defendant Essex County Board of Taxation (hereinafter referred to as the county board) has taken no position on the merits of the *519 controversy and asserts by way of separate defenses that the complaint fails to state a claim upon which relief may be granted; that there has been a failure to exhaust administrative remedies and that the court lacks jurisdiction; and further, it "reserves the right to move for dismissal of the complaint" on these various grounds. In the pretrial order the pleadings were deemed amended to make more explicit the contentions of defendant townships that the property of East Orange was not devoted to recreational uses and that, even without regard to such use, it was not entitled to exemption; and further, that the defenses of estoppel and laches apply.
The challenge to the authority of the court to entertain the action because of plaintiff's failure to exhaust administrative remedies should be disposed of at the threshold of the case. East Orange, pursuant to N.J.S.A. 54:4-23.14, filed applications with the assessors of Livingston and Millburn on September 13 and 29, 1967, respectively, for the taxation of its property located in these municipalities on the basis of farmland for the 1968 tax year.[1] The assessors of Livingston and Millburn rejected these applications.
There can be no question that the determinations of the assessors of these taxing districts are appealable to the county board of taxation. N.J.S.A. 54:3-21; Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157 (1949). Under R.R. 4:88-14 the court would ordinarily not be entitled to preempt the county board in exercising jurisdiction over this controversy in the absence of countervailing circumstances demonstrating forcibly that the "interests of justice" require that administrative remedies be by-passed. Central R.R. Co. of N.J. v. Neeld, 26 N.J. 172 (1958), *520 certiorari denied 357 U.S. 928, 78 S.Ct. 1373, 2 L.Ed.2d 1371 (1958).
Plaintiff contends that such circumstances obtain. In particular, it points to important and novel questions of law involving the construction of the Farmland Assessment Act of 1964 and the application of the act to a municipally-owned watershed. These considerations alone, however, would not be sufficient to side-step the appropriate administrative agency. The resolution of these questions requires the taking of evidence and the finding of facts preliminary to an ultimate determination of the legal issues. A case in this posture must be regarded as within the competence of the appropriate administrative agency having jurisdiction to adjudicate the controversy. Roadway Express, Inc. v. Kingsley, 37 N.J. 136 (1962). Nevertheless, there should be a diligent assessment of all the circumstances to determine whether or not the interests of justice require an exception to the rule of exhaustion of administrative remedies. Waldor v. Untermann, 10 N.J. Super. 188 (App. Div. 1950). The rule is essentially one of procedure for the proper administration of justice; it is neither jurisdictional nor absolute. Ibid.; Nolan v. Fitzpatrick, 9 N.J. 477 (1952); Ward v. Keenan, 3 N.J. 298 (1949).
Factors which might bear on the question of exhaustion of administrative remedies are relative relay and expense, possible prejudice to any of the litigants the public interest, the nature of the issues, and the extent to which the discretion of the administrative agency should be invoked in an adjudication. Cf. Port of N.Y. Authority v. Essex Cty. Board of Taxation, 46 N.J. 51 (1965). Many of these factors are present here. The litigants are governmental bodies. The controversy involves directly and primarily the public interest. The issues raised by the complaint are novel. While there is evidence to be taken and facts to be found, there is not involved in the present action the issue of valuation of property for tax purposes. In this sense, therefore, the special expertise of the county board *521 relative to tax valuation need not be involved in the adjudication of the issues in this case.
More importantly, the pretrial order especially required all defendants to bring by motion the defense based upon plaintiff's failure to exhaust administrative remedies and to bring such a motion sufficiently in advance of trial so that there could be a timely disposition thereof. The purpose of this provision in the pretrial order was made abundantly clear to all the parties at the time of the pretrial conference. It was to obviate the expense and effort of preparation and the investment of time which would otherwise be entailed in a trial if the complaint were not to be dismissed on this ground. Defendants failed to make such motions. Moreover, the county board, a party to the action and the administrative agency with statutory jurisdiction of the cause, disclaimed any interest in the controversy and did not itself move to have the matter dismissed or remanded on any grounds advanced in its answer, including failure to exhaust administrative remedies. As a result, there was a full plenary trial, consuming approximately three days, with the production of considerable expert and lay testimony and other evidence. Under these circumstances, the interests of justice dictate that the controversy be presently and expeditiously resolved on the merits by the court.
The defenses of estoppel and laches should be similarly addressed at the outset. It is asserted that East Orange is "in laches" and is "estopped" to claim that its Water Reserve is now taxable as farmland or otherwise exempt because it has acquiesced and consented for many years in the valuation, assessment and taxation of these lands as a watershed under N.J.S.A. 54:4-3.3. The doctrine of estoppel has been invoked in order "to prevent manifest wrong and injustice," but "it is not applied to a governmental agency performing a governmental function to the same extent as it is against individuals and private corporations." Feldman v. Urban Commercial Inc., 70 N.J. Super *522 463, 477 (Ch. Div. 1961); Vogt v. Borough of Belmar, 14 N.J. 195 (1954); Springfield Tp. v. Bensley, 19 N.J. Super. 147 (Ch.. Div. 1952). The collection of taxes is an essential governmental function and a municipality will not be estopped in the proper performance of this duty even though it may be required to reverse or modify a position previously taken. City of Bayonne v. Murphy & Perrett Co., 7 N.J. 298 (1951). That East Orange has heretofore not challenged or disputed the taxability of its Water Reserve under N.J.S.A. 54:4-3.3 in no way estops it from asserting a different legal position today. It does not seek to undo taxes paid for years past. The public interest will not suffer by permitting East Orange to press its contentions; indeed, the public interest might lie in that direction. The doctrine of estoppel may not be invoked under these circumstances. The same reasoning and considerations would also preclude a bar to the action based upon laches. Thornton v. Ridgewood, 17 N.J. 499 (1955).
The property constituting the East Orange Water Reserve consists of a tract approximately 2,300 acres; 1470 acres are located in Livingston, 634 in Millburn, and 181 in Florham Park. East Orange acquired this tract over a great many years beginning in 1903. Some of the lands were acquired by deed and some through condemnation for the purpose of water supply and for the protection of water supply. The land has been used for this purpose since 1905 and it is presently utilized by East Orange for this purpose, that is, as a source of potable water which it supplies to its inhabitants. The actual source of the water is an aquifer, a subterranean water-bearing stratum or level beneath the surface. It was described by Ralph M. Legette, a ground water geologist and consultant familiar with the East Orange Water Reserve properties, as a glacial valley consisting of depositions of highly permeable sand and gravel which extends not only throughout the entire East Orange Water Reserve but also beyond in a general direction toward Chatham, Florham Park, Madison, Morristown and East Hanover, *523 which municipalities also derive water from these sources. No water is drawn directly from the surface. It is drawn from 13 wells which are located in well fields denominated as the Braidburn, Dickinson, Slough Brook and Canoe Brook well fields. Three of the wells are in Florham Park; seven are in Livingston and three in Millburn. As stated by Daniel Carluccio, water engineer and secretary to the Board of Water Commissioners for East Orange, who is directly in charge of the Water Reserve, the wells and well fields are widely separated and the entire 2,300 acres is needed as a "watershed" in order to protect the water source in the well fields and, through proper infiltration and percolation of surface waters, to enable the wells to be replenished. It was pointed out by Legette that virtually the entire surface area of this watershed is involved in the protection and replenishment of the underground water supply. It was explained that the well fields throughout the East Orange Water Reserve, as well as the aquifer throughout the similar adjoining property of the Commonwealth Water Company, all contained relatively impermeable clay-like materials which constituted an underground storage area, "like a huge bathtub." The well fields themselves are in these "storage areas" and not in what was characterized as "recharge areas." Recharge areas are surface areas where water from rainfall percolates and infiltrates into the ground and then flows through natural underground drainage into the deeper areas constituting the well fields. Maps offered into evidence indicate the general location of the well fields which seem to extend with indefinite boundaries like a large crescent along the westerly, southerly and easterly areas of the tract. The subterranean well fields themselves appear to constitute in extent considerably less than one-half of the total area of the Water Reserve. Legette stated that all of the remaining portion of the tract, which completely surrounds the area of the well fields, was a "potential recharge area," that is, the surface area necessary for the replenishment of the well fields. There are no reservoir or water storage facilities within *524 the confines of the Water Reserve itself. Water is pumped from the wells via a network of pipe lines to reservoirs located beyond the boundaries of the East Orange Water Reserve. There is a well house over each well and there are other operating equipment and storage facilities for equipment and machinery on the Reserve.
Most of the 1470 acres of the Water Reserve located in Livingston are heavily wooded, with some open, low meadowland, traversed by brooks and streams. In Millburn approximately 415 acres is woodland; 75 acres is open meadow or "pasture" land; there are some houses, actually former farmhouses, now utilized by employees of the East Orange Board of Water Commissioners on approximately ten acres of land, and a municipal golf course, the East Orange Golf Course, on 134 acres. In Florham Park the land is mostly low meadowland with few, very small trees, at a level below the flood plain of the Passaic River, which becomes extensively flooded in heavy rainfall.
East Orange asserts that substantial portions of its Water Reserve are taxable pursuant to the Farmland Assessment Act of 1964. In its application to Livingston for the taxation of its land under the act, filed on September 13, 1967, it stated that 1,250 acres constituted "woodland devoted to agricultural or horticultural use" and 220 acres constituted "permanent pasture." Ten acres were designated as being "land under and land used in connection with farmhouse." According to its application, all of its watershed acreage located in Livingston was devoted to agricultural or horticultural use. In the application filed with Millburn on September 28, 1967 covering 634 acres, 415 were designated as "woodland devoted to agricultural or horticultural use" and 75 as "permanent pasture," making a total of 490. Also designated as within the broad category of "farm acreage" were ten acres used in connection with farmhouses, and 134 acres, apparently the golf course, stated to be not otherwise devoted to agricultural or horticultural use. Thus, according to both applications, it may be inferred that East Orange *525 considered that all of its watershed acreage located in Livingston and Millburn was in Agricultural use, with the exception of the golf course and the farmhouse properties (not eligible under the act).
Historically, the property in question has been taxed pursuant to N.J.S.A. 54:4-3.3; e.g. In re Appeal of City of East Orange, 80 N.J. Super. 219 (App. Div. 1963). The salient portion of the statute authorizing the taxation of these lands as a municipal watershed provides:
"* * * The lands of counties, municipalities, and other municipal and public agencies of this State used for the purpose and for the protection of a public water supply, shall be subject to taxation by the respective taxing districts where situated, at the taxable value thereof, without regard to any buildings or other improvements thereon, in the same manner and to the same extent as the lands of private persons, but all other property so used shall be exempt from taxation. * * *"
East Orange contends that the tax status of its Water Reserve was altered by the later enactment of the Farmland Assessment Act of 1964 and it is now taxable as farmland "in the same manner and to the same extent as the lands of private persons." The Farmland Assessment Act of 1964 provides:
"[F]or general property tax purposes, the value of land, not less than 5 acres in area, which is actively devoted to agricultural or horticultural use and which has been so devoted for at least the 2 successive years immediately preceding the tax year in issue, shall, on application of the owner, and approval thereof as hereinafter provided, be that value which such land has for agricultural or horticultural use." N.J.S.A. 54:4-23.2
It is asserted that the Water Reserve is to be considered as "actively devoted to agricultural or horticultural use" by virtue of successive statutory provisions, viz.:
"Land shall be deemed to be in agricultural use when devoted to the production for sale of plants and animals useful to man, including but not limited to: forages and sod crops; grains and feed crops; dairy animals and dairy products; poultry and poultry products; *526 livestock, including beef cattle, sheep, swine, horses, ponies, mules or goats, including the breeding and grazing of any or all of such animals; bees and apiary products; fur animals; trees and forest products; or when devoted to and meeting the requirements and qualifications for payments or other compensation pursuant to a soil conservation program under an agreement with an agency of the Federal Government." N.J.S.A. 54:4-23.3
"Land shall be deemed to be actively devoted to agricultural or horticultural use when the gross sales of agricultural or horticultural products produced thereon together with any payments received under a soil conservation program have averaged at least $500.00 per year during the 2-year period immediately preceding the tax year in issue, or there is clear evidence of anticipated yearly gross sales and such payments amounting to at least $500.00 within a reasonable period of time." N.J.S.A. 54:4-23.5
The Water Reserve is said to be "in agricultural use" within the meaning of the act because it consists of pastureland and is used for the growing and sale of hay, timber and cordwood from which East Orange derives an annual income in excess of the statutory minimum. It also is asserted tangentially that the Water Reserve is entitled to farmland assessment because it is under a federal soil conservation program.
Certain of these contentions are devoid of any factual basis. As to the claim based upon use as "permanent pasture," N.J.S.A. 54:4-23.3 includes as an agricultural use land devoted to "the breeding and grazing of any or all of such animals," i.e. "livestock, including beef cattle, sheep, swine, horses, ponies, mules or goats." It was admitted by East Orange that there is no livestock pastured on the Water Reserve and no part of its Water Reserve is presently used as a pasture, although it states that it is "available" for such use. Clearly, no portion of the Water Reserve which it has characterized as "permanent pasture" could qualify under the statute.
Land may be entitled to special treatment as farmland if it meets the "requirements and qualifications for payments or other compensation pursuant to a soil conservation program under an agreement with an agency of the Federal Government." N.J.S.A. 54:4-23.3. This evidently *527 refers to the Federal Soil Bank Program pursuant to 7 U.S.C.A. § 1801 et seq. or an equivalent program. See, New Jersey Department of Treasury, Division of Taxation, "Regulations Governing the Valuation, Assessment and Taxation of Land Under the `Farmland Assessment Act of 1964,' etc." (August 10, 1964), Reg. 16:12-10. 360(e). On February 17, 1967 the East Orange Board of Water Commissioners apparently filed an application for assistance with the Northeast Jersey Soil Conservation District pursuant to N.J.S.A. 4:24-22. Its application indicated that the tract was presently used for the East Orange Water Reserve. The stated purpose of the application was to obtain assistance to determine whether "proposed recreational and educational uses will impair water run-off and water supply in the aquifer in conjunction with contemplated water demands"; for "planning and increased protection from soil erosion and for replenishing aquifer"; for "possible area of thinning and use of trees for sale purposes and for city participation," and for "possible training programs in soil conservation in conjunction with schools, neighborhood youth corps and other city youth groups." There was no evidence that any agreement was actually entered into pursuant to this application or that such an application or following agreement would be "pursuant to a soil conservation program of the Federal Government" or an equivalent program, or would entitle East Orange to any payments or other compensations. In fact, no compensation or payments have been received. Patently, East Orange can claim no benefit from the provisions of N.J.S.A. 54:4-23.3 referable to a soil conservation or similar program undertaken with the Federal Government.
East Orange's primary contentions for eligibility under the Farmland Assessment Act are based upon the sale of hay, timber and firewood from the Water Reserve. In the south-westerly portion of the Water Reserve, located in Livingston, there are approximately 40 acres commonly called the "Eckert Farm." Many years ago a portion of this property *528 was sown with hay and this crop has been harvested and sold each year. East Orange itself did not sow the hay. It had been planted while in private hands and the crop is a perennial growth. It is actually harvested by a private purchaser who mows, bales and removes the crop. East Orange received for the sale of its hay $81.80 in 1965, $43.50 in 1966 and $40 in 1967.
East Orange also engages in an active program with respect to the woodlands which cover most of the surface of the Water Reserve. At one time areas of its woodlands were replaced or augmented with stands of evergreen trees. Evergreens were generally used in connection with the maintenance of watersheds in the northeastern part of the country for the purpose of providing a tree which, it was thought, would minimize the transpiration of water, provide an adequate ground cover, prevent or discourage erosion, and reduce the quantity of leaves and organic materials which might otherwise find their way into the water supply. According to Roswell M. Roper, the forest ranger employed by the East Orange Water Department, and the individual in charge of maintaining the Water Reserve woodlands, the evergreens were gradually replaced by hardwood trees. It was found that the evergreens had resulted in many damaged and fallen trees which has to be cleared and removed. Also, a better commercial market existed for hardwoods. Roper stated that timber on the Water Reserve is systematically cut by a crew of men employed by the East Orange Water Department under his supervision in accordance with a program devised and directed by the New Jersey State Department of Conservation and Economic Development. Under that program, trees are designated by the State for removal. The removal is actually undertaken by a logger, a private person, who is in the business of selling timber and lumber. When trees are cut the bulk of the tree is utilized for lumber, the tops for cordwood or firewood, and the remaining portions are destroyed. In 1967 approximately $700 worth of timber was sold; in 1966 $3,002.08 and in 1965 $24,664.05 *529 were realized from the sale of timber. For these years the sales resulting from cordwood were $809.75, $717 and $325, respectively. From 1943 through 1967 the East Orange Water Department realized a total of $54,316.26 from the sale of timber, and for the period 1945 through 1967 the sum of $23,380.08 from the sale of cordwood. At times in the past the Water Department also sold live trees or nursery stock and evergreen products such as wreaths, but there have been no appreciable sales of these products for more than a decade.
Roper stated that the forest on the East Orange Water Reserve is managed with a view towards producing income. Alden T. Cottrell, who had been the Chief of the Bureau of Forestry in the New Jersey Department of Conservation and Economic Development, and who was personally familiar with the agreement between the State and the Board of Water Commissioners of East Orange covering forestry service, also recognized that a purpose of the agreement, as stated therein, was to manage the woodland and to sell "some timber."
It is abundantly clear that the lands of the East Orange Water Reserve are used for the purpose for which they were originally acquired, namely, "for the purpose and for the protection of a public water supply." Any other uses of or activities upon the said properties are merely incidental to the use of the land as a watershed. Lands thus "used for the purpose and for the protection of a public water supply" are specifically taxable under N.J.S.A. 54:4-3.3. Originally such lands were exempt from taxation, along with other municipal lands used for a public purpose. City of Perth Amboy v. Barker, 74 N.J.L. 127 (Sup. Ct. 1907). The special taxation of watershed properties as an exception to the general exemption accorded municipal land used for a public purpose was provided by L. 1910, c. 118, which was enacted as a supplement to the General Tax Act of L. 1903, c. 208. Thus, municipally-owned watershed lands have long been the subject of special tax treatment. *530 E.g., Jersey City v. Blum, 101 N.J. 93 (E. & A. 1925); Town of Morristown v. Randolph Tp., 19 N.J. Misc. 413, 20 A.2d 355 (St. Bd. Tax App. 1941; Borough of Wanaque v. North Jersey District Water Supply Commission, 20 N.J. Misc. 232, 26 A.2d 569 (St. Bd. Tax App. 1942); City of Newark v. Township of Jefferson, 25 N.J. Misc. 363, 53 A.2d 813 (St. Bd. Tax App. 1947). As stated by the Supreme Court in City of Newark v. West Milford Tp., 9 N.J. 295 (1952).
"We apprehend that the purpose and intent of the statute, R.S. 54:4-3.3, is to distribute the tax burden of the taxing district equably between the municipality owning watershed lands and the lands of the other taxpayers of the district". (at p. 301)
If such lands are now to be considered taxable under the Farmland Assessment Act of 1964 by virtue of an Agricultural use thereon, notwithstanding their continued utilization as a public water supply, then L. 1910, c. 118, N.J.S.A. 54:4-3.3, must, by implication, be regarded as having been substantially repealed by the latter enactment of the Farmland Assessment Act of 1964. A construction of the latter act that would product this result cannot be easily indulged. The implied repeal of a statute is a disfavored doctrine. It may be found only where a subsequent expression of legislative will so clearly conflicts with an earlier statute relating to the same subject that the two cannot stand together reasonably and a legislative intention to supersede the earlier law must be inferred. Dept. of Labor and Industry v. Cruz, 45 N.J. 372 (1965). Evidence of such an intention on the part of the Legislature to repeal a prior act must, in the absence of an express repealer, be clear and compelling. Loboda v. Clark Tp., 40 N.J. 424 (1963).
East Orange argues that there is no conflict between the two statutes because N.J.S.A. 54:4-3.3 specifically authorizes the taxation of a municipal watershed "in the same manner and to the same extent as the lands of private persons"; and the Farmland Assessment Act merely provides *531 a new mode or method of tax valuation for certain types of land, which can be incorporated by reference into the body of N.J.S.A. 54:4-3.3. It argues, further, that if its Water Reserve is not accorded farmland assessment similar to the "lands of private persons," this would be a denial of constitutional "equal protection." Defendants urge that the Legislature has dealt with the taxation of municipal watersheds as a matter separate and apart from its consideration and treatment of farmlands, and that there is no conflict between N.J.S.A. 54:4-3.3 and N.J.S.A. 54:4-23.1 et seq., because these statutes do not relate to the same subject.
Preliminarily, it may be noted that East Orange's standing to premise a defense on a denial of "equal protection" is tenuous. Cf. Camden County v. Pennsauken Sewerage Auth., 15 N.J. 456 (1954). Moreover, if East Orange were not accorded the same tax treatment as private persons under the Farmland Assessment Act with respect to its Water Reserve, it does not follow that there would be a denial of "equal protection." This turns upon the legislative purpose involved in the various tax statutes. The Legislature has broad power to provide disparate treatment of different objects of taxation and to utilize its tax powers selectively in order to effectuate particular public policies and social or economic goals. WHYY, Inc. v. Borough of Glassboro, 50 N.J. 6 (1967); General Electric Co. v. Passaic, 28 N.J. 499 (1958), appeal dismissed 359 U.S. 1006, 79 S.Ct. 1146, 3 L.Ed.2d 987 (1959).
The statutory history of the Farmland Assessment Act of 1964 belies an intent on the part of the Legislature to deal in any way with municipal watershed lands or to subject such land to taxation as farmland. The Farmland Assessment Act of 1964 had its modern genesis in L. 1960, c. 51. Chapter 51 of the Laws of 1960 was a basic revision and change of the laws relating to the taxation of real and personal property. With respect to farmlands, chapter 51, § 23 provided that
*532 "* * * in the assessment of acreage which is actively devoted to agricultural use, such [taxable] value shall not be deemed to include prospective value for subdivisions or nonagricultural use." c. 51, § 23
The Supreme Court, in Switz v. Kingsley, 37 N.J. 566 (1962) held that this statutory provision was unconstitutional under N.J. Const. (1947), Art. VIII, § I, par. 1, which required the application of the same standard of value to all real property taxable for local use.
The purpose of section 23 of chapter 51 of the Laws of 1960 was to counter the adverse impact of property taxation upon agriculture and to provide farmers with some measure of tax relief. Senate Committee on Revision and Amendment of Laws, Public Hearings, "Legislative Conference Group on Full Value Assessments", vol. 2 pp. 16, 20 82, 2-A (March 2, 1960). When this failed of accomplishment because of the ruling in Switz v. Kingsley, supra, a committee, the Governor's Farmland Assessment Committee, was appointed to make a study and develop recommendations with respect to the assessment of farmlands of the State. The Commission on State Tax Policy was also cognizant of this problem. In January 1963 it noted the "adverse effects of the mounting property tax burden on the farmers of New Jersey" and the "view that if agriculture is to survive in New Jersey the property tax burden on farmlands must be eased." It declined to suggest any solution to "this particular tax question" since it was being studied by the special citizens' committee appointed by the Governor. State Tax Policy Commission, Ninth Report, pp. 109-111 (January 10, 1963).
In its study the Governor's Committee considered these objectives, viz: "(a) the desirability of continuing the family farm in New Jersey and the farmer's problem; (b) the interests of the municipalities and the problems of the assessors; and, finally, (c) the interests of all the people of New Jersey in maintaining `open' space, the beauty of our countryside and in the availability of agricultural products fresh from the farm." Report of Governor's Farmland *533 Assessment Committee (March 20, 1963). Significantly, the committee recognized distinctions between farmlands, which were the subject of its present concern, and other types of land, such as watersheds, forests and recreational areas, which it felt should be included, along with farmlands, in future studies of land control and development in the State. Id. p. 2.
The committee recommended the introduction of a legislative bill proposing a constitutional amendment which would permit the separate assessment of agricultural lands. Senate Concurrent Resolution No. 16 (1963), the proposed constitutional amendment which followed this recommendation, provided:
"Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.
(b) The Legislature shall enact laws to provide that the value of land, not less than 5 acres in area, which is determined by the assessing officer of the taxing jurisdiction to be actively devoted to agricultural or horticultural use and to have been so devoted for at least the 2 successive years immediately preceding the tax year in issue, shall, for local tax purposes, on application of the owner, be that value which such land has for agricultural or horticultural use.
Any such laws shall provide that when land which has been valued in this manner for local tax purposes is applied to a use other than for agriculture or horticulture it shall be subject to additional taxes in an amount equal to the difference, if any, between the taxes paid or payable on the basis of the valuation and the assessment authorized hereunder and the taxes that would have been paid or payable had the land been valued and assessed as otherwise provided in this Constitution, in the current year and in such of the tax years immediately preceding, not in excess of 2 such years in which the land was valued as herein authorized.
Such laws shall also provide for the equalization of assessments of land valued in accordance with the provisions hereof and for the assessment and collection of any additional taxes levied thereupon and shall include such other provisions as shall be necessary to carry out the provisions of this amendment."
By its plain terms S.C.R. 16 dealt only with the subject of farmlands and their taxation. This proposed constitutional *534 amendment, according to its accompanying statement, was recommended as "being essential to encourage the retention of agriculture as an industry in the State and to preserve agricultural lands in an open space condition."
A public hearing was held on S.C.R. 16. It was apparent that the main objective of the proposed amendment was to enable and encourage farmers to continue to farm their land in the face of dwindling farm incomes and mounting costs, not the least of which was sharply increasing real estate taxes. Senate Committee on Revision and Amendment of Laws, Public Hearing, "Senate Concurrent Resolution No. 16, etc." (April 15, 1963). There were also other incidental, beneficent purposes anticipated by its proponents, such as fostering agriculture in the State for the good of the general economy, ameliorating problems of urban growth in rural municipalities, and encouraging the preservation of open spaces. Id., pp. 5, 11-13, 16, 33-35. But, as noted, the primary objective was to save the "family farm" and to provide farmers with some economic relief by permitting farmlands to be taxed upon their value as on-going farms and not on any other basis.
At the general election held November 5, 1963 the proposed constitutional amendment carried. N.J. Const. (1947), Art. VIII, § I, par. 1, as amended. Chapter 48 of the Laws of 1964 became the implementing legislation. By its terms, it accords preferential tax treatment to eligible farm land. This constitutes a dramatic reversal of a state tax history which did not countenance distinctions as to classes of real estate for tax purposes. Siegal v. City of Newark, 38 N.J. 57 (1962); Switz v. Kingsley, supra. Indeed, at the public hearings on S.C.R. 16 some opposition was expressed on the ground that the proposed amendment did represent a sharp break with past tax policy and, even though it only applied to farmlands, it might become a precedent, leading to preferential tax treatment of other kinds of real estate. Senate Concurrent Resolution No. 16, Public Hearing, op. cit. pp. 18-31.
*535 The Farmland Assessment Act of 1964, in the light of its constitutional underpinning, should, therefore, be understood in terms of its evident intent and purpose. It is clear that the people in adopting S.C.R. 16 as an amendment to the Constitution, and the Legislature by its enactment of the Farmland Assessment Act of 1964, did not intend to treat in any way or to confer any special, different, or new tax status upon municipally-owned water sheds.[2] Such a result is not warranted by implication.
In sum, the Farmland Assessment Act of 1964, L. 1964, c. 48; N.J.S.A. 54:4-23.1 et seq., has no application to municipal lands actually used "for the purpose and for the protection of a public water supply" and otherwise taxable under N.J.S.A. 54:4-3.3.
Moreover, even if a municipal watershed were within the ambit of the Farmland Assessment Act of 1964, the agricultural activities undertaken on the East Orange Water Reserve would not qualify these lands for taxation as farmlands. The pointed inquiry on this hypothesis is whether, by virtue of the activities relating to the sales of hay, timber and cordwood, it can be said that the East Orange Water Reserve is "actively devoted" to "agricultural *536 use" within the meaning of N.J.S.A. 54:4-23.2. Even though the agricultural use is "active" in the literal sense that East Orange has realized income in excess of $500 per annum for the past two years from the sale of timber, cordwood and hay (N.J.S.A. 54:4-23.5), compliance with this single criterion does not per se render the Water reserve as land "devoted" to agricultural use. To be "in argicultural use" under the act, land must actually be "devoted to the production for sale of plants * * * useful to man, including but not limited to * * * trees and forest products * * *." It may be accepted that trees and forest products are a derivative of the East Orange Water Reserve. It does not follow therefrom that the East Orange Water Reserve is devoted to the production for sale of its trees and forest products.
In ascertaining the meaning of a statute, the language employed should be given its ordinary and common significance. Lane v. Holderman, 23 N.J. 304 (1957). It is to be recognized, however, that "words are inexact tools at best, [and] resort may freely be had to the pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used." Lloyd v. Vermeulen, 22 N.J. 200, 206 (1956). In brief, the term "devote" must be understood in its usual significance and in a manner which will sensibly effectuate the salient statutory *537 objective of providing tax relief with respect to lands committed to farming.
The verb "devote" denotes variously "1. * * * to set apart or dedicate by a solemn act; to consecrate; * * *2. to give up wholly; to addict; to direct the attention of wholly or chiefly". A synonym is "to set apart" or "to appropriate". An equivalent verb is "to dedicate". Webster's New International Dictionary, 715 (1948 ed.), 715.
All of the experts recognized that there can be multiple uses of woodlands or forests, which could include or combine the production of water, wood, recreation, education and the like. Depending upon the particular lands involved, one use tends to become dominant. The principal use of the East Orange Water Reserve is a watershed. Any commercial gain from the sale of hay, timber or wood is merely an incidental by-product of the maintenance of the Water Reserve woodlands. The management of the forest, including the planting, harvest and removal of trees, is for the essential purpose of encouraging the recharge and replenishment of the underground wells. As far as the state program is concerned, the cutting plan for trees is not for the purpose of producing lumber commercially but with a view towards the primary use of lands as a watershed. Consequently, from any vantage point, the agricultural uses of the Water Reserve must be regarded as subservient to its dominant use as a public water supply. In no sense, therefore, can it be said that the East Orange Water Reserve is devoted, that is, committed, or dedicated, or set apart or appropriated, or given up wholly or chiefly to the production for sale of agricultural products of any kind within the meaning of the Farmland Assessment Act of 1964. To the contrary, it is devoted to the purpose for which it was originally acquired by East Orange, namely, for the purpose and the protection of a public water supply.
East Orange also claims that portions of its Water Reserve are entitled to be fully exempt from taxation because they are used for recreational and educational purposes. Approximately *538 134 acres of its watershed located in Millburn off Parsonage Hill Road is used as a public golf course for the benefit of the residents of East Orange and Millburn. This facility, the East Orange Golf Course, has been in such use since 1925. A well is located just beyond the northernmost boundary of the course and a water pipe line extends underground the entire length of the course from north to south to the East Orange Pumping Station located near the intersection of Parsonage Hill Road and the John F. Kennedy Parkway. The method of operating this golf course facility was the subject of recent litigation. City of East Orange v. Bd. of Water Com'rs, etc. 41 N.J. 6 (1963). As a result, its operation was taken over by East Orange in 1963 and its operations are now supervised by the East Orange Recreation Department pursuant to a joint agreement with Millburn.
An area of the watershed of approximately 200 acres has also been designated as a nature center. This area is located in both Livingston and Millburn, roughly between White Oak Ridge Road, Parsonage Hill Road and South Orange Avenue. Situated within this area is a body of water known as Baldwin Pond. It would appear that the Canoe Brook well field extends beneath a considerable portion of this nature center area and two wells are within the area. The only improvements made in connection with the nature center are an open wooden shelter and some nature trails. A summer program has been undertaken by the East Orange Recreational Department. In the summer of 1967, for six weeks, approximately 50 children per week from East Orange were brought into the area on a daily basis where they participated in boating, fishing, nature walks and instruction. A similar program is underway during the current summer. Occasionally the Water Reserve is made available to persons or groups interested in bird-watching.
East Orange initiated its claim for the tax exemption of these areas by sending identical letters, through its attorney, on September 28, 1967 to the tax assessors of Millburn and Livingston, stating simply that lands depicted on an attached map have been used for "recreational purposes" for the *539 year 1967 and requesting that "these lands be totally exempted from taxation." As far as it appears, no further explanation or supporting data were furnished and no official response was elicted. East Orange's claim for this exemption is based upon the initial provisions of N.J.S.A. 54:4-3.3, viz:
"Except as otherwise provided by article 1 of this chapter (§ 54:4-1 et seq.), the property of the State of New Jersey; and the property of the respective counties, school districts and taxing districts used for public purposes, * * * shall be exempt from taxation under this chapter, * * *"
It would appear that the authority of East Orange to use its Water Reserve for any purpose other than one which is merely incidental to a public water supply is sharply limited. Another use of the Water Reserve cannot be undertaken unless it will not impair "the operation and function, present or anticipated of the water supply and water reserve system". R.S. Cum. Supp. 40:103-5 (101); L. 1963, c. 149, § 31; but cf. City of East Orange v. Bd. of Water Com'rs of East Orange, 40 N.J. 334 (1963). The present use of portions of the Water Reserve as a golf course and nature study center do not interfere with the function and operation of the water supply system. They are completely subordinate to operations of the public water supply system. They are under the overriding control and jurisdiction of the Board of Water Commissioners of East Orange. No activities can be undertaken with respect to these or any other uses of the Water Reserve without the approval of the Board of Water Commissioners. They may be disbanded, moved or changed if the water supply operations are imperiled.
It is not necessary for the court to determine whether these activities, as a golf course and nature center, constitute a "public purpose" within the meaning and intendment of N.J.S.A. 54:4-3.3. The statutory tax exemption of municipal property used for a public purpose is one of long standing. It is a statute of general applicability extending *540 to all lands of a municipality used for public purposes. E.g. Hanover Tp. v. Town of Morristown, 4 N.J. Super. 22 (App. Div. 1949). At one time this statutory exemption encompassed municipal lands used in connection with a public water supply. L. 1903, c. 208; City of Perth Amboy v. Barker, supra. This general exemption was expressly repealed, however, with respect to municipal lands used for the purpose and for the protection of a water supply by the enactment of L. 1910, c. 118. This latter statute is a specific one relating to municipal lands used for a water supply and it obviously deals "in a more minute and definite way" (Hackensack Water Co. v. Division of Tax Appeals, supra, 2 N.J., at p. 164.) with the taxation of this type of municipal land. A statute dealing specifically with a particular subject ordinarily controls, in contrast to a broad or undifferentiated statute generally encompassing the same area. State v. Hotel Bar Foods, Inc., 18 N.J. 115 (1955); State, by State Highway Com'r v. Dilley, 48 N.J. 383 (1967). It must be concluded, therefore, that the specific and detailed statute directed to the taxation of municipal lands used for the particular purpose of a public water supply governs their tax status, rather than the broad exemption statute relating to all municipal lands generally used for a public purpose.
There is not involved in this case the effect of the recreational or educational activities upon the valuation of the Water Reserve. The valuation of watershed properties for tax purposes is an exercise of considerable complexity. A proper determination of the true or taxable value of municipal watershed lands should involve a consideration and comparison of "representative component parts of the various classifications of the lands" (Newark v. West Milford, supra, 9 N.J., at p. 308) and of "appropriate marketable segments thereof" and the "natural attributes" of various parcels of land (In re Appeal of East Orange, supra, 80 N.J. Super., at pp. 231). In a proper proceeding involving the valuation and assessment of these lands for tax purposes, it may or may not be determined that the use of portions *541 of the Water Reserve as a golf course or nature study center has an impact upon market value. Cf. Borough of Englewood Cliffs v. Estate of Allison, 69 N.J. Super. 514 (App. Div. 1061). But this is an entirely different question, unrelated to the issue of whether such areas are generally taxable as watershed lands under N.J.S.A. 54:4-3.3, or are fully exempt from taxation under a different provision of the same statute. To hold that East Orange's Water Reserve may be exempted from taxation because subjected incidentally to other public purposes would work a result inconsistent with the explicit provisions for the taxation of municipally-owned watershed lands and would be utterly inimical to the recognized purpose of taxing such lands in order to distribute fairly and equitably among all taxpayers the burden of taxes within the particular taxing districts.
In accordance with this opinion, judgment shall be found in favor of the defendants. An appropriate order shall be submitted.
NOTES
[1] East Orange did not file an application for farmland assessment with Florham Park. Upon a motion for involuntary dismissal during trial, the court dismissed the complaint against Florham Park on the grounds that no timely application for farmland assessment had been filed by East Orange and there was no evidence that any lands of East Orange situated in Florham Park were "in agricultural use" under N.J.S.A. 54:4-23.1 et seq.
[2] At present a bill, Assembly Bill No. 436 has passed both houses of the New Jersey Legislature and is awaiting action by the Governor. This bill was introduced on February 13, 1968, after the filing of the complaint herein by East Orange. It purports to be a supplement to the Farmland Assessment Act of 1964 and provides:

"Nothing contained in the act of which this act is a supplement shall be deemed or construed to apply to lands of counties, municipalities, or other municipal and public agencies of this State used for the purpose and for the protection of a public water supply and such lands shall continue to be subject to taxation as provided in section 54:4-3.3 of the Revised Statutes."
The effect of amendatory bills or statutes upon the determination of legislative intent in the passage of an original enactment is uncertain at best. See e.g., Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486 (1965); Eagle Truck Transport, Inc. v. Board of Review, etc., 29 N.J. 280, 291 (1959); Bd. of Education, City of Asbury Park v. Hoek, 38 N.J. 213, 235, 236 (1962). The remarks made by the court in Edwards v. Mayor, etc., of Borough of Moonachie, 3 N.J. 17, 24 (1949), however, are apposite as to the possible effect of A. 436 upon the interpretation of N.J.S.A. 54:4-23.1 et seq.
"The subsequent amendment * * * does not suggest a contrary legislative understanding of the terms of the original statute. The amendment was made after respondent's attack upon the particular ordinance as ultra vires; and it is clear that it was designed merely to clarify the doubt thus ensuing and to declare the true meaning of the original terms. [Citations omitted]. We would say, however, that while entitled to due consideration, the subsequent legislative construction of a statute is not conclusive of the significance of the prior act. The Legislature cannot authoritatively declare what a law is or has been, for that is essentially a judicial function."