MENYUK, J.T.C.
This is an appeal from a judgment of the Monmouth County Board of Taxation affirming the defendant’s assessor’s denial of plaintiffs’ application to have their property valued, assessed, and *42 taxed as farmland for tax year 2002. The subject property is known as 60 Rumson Road and is identified on the municipal tax map as Block 100, Lot 3. The contested assessment is as follows:
Land $ 686,900
Building $ 716,600
Total $1,403,500
The issue is whether the plaintiffs actively devoted a minimum of five acres to agricultural use. See N.J.S.A 54:4-23.2, (providing that the value of land, not less than five acres in area, and actively devoted to agricultural use, is eligible for valuation as farmland.) Plaintiffs contend that, of a total lot size of 6.176 acres, 5.056 acres are devoted to agricultural use, and that the minimum five-acre requirement has therefore been met. Defendant contends that of a total of 6.167 acres, 1.45 acres is related to the use and enjoyment of the farmhouse, and that only 4.717 acres remains for agricultural use. Defendant also asserts that not all of that 4.717 acres is devoted to agricultural use. For the following reasons, I find that the plaintiffs have failed to establish that five acres of the subject property are actively devoted to agricultural use and conclude that the property is not entitled to be assessed as farmland under the Farmland Assessment Act of 1964, N.J.S.A 54:4-23.1 to -23.23 (the “Act”).
Plaintiffs purchased the subject property in June 1998. The principal agricultural activity on the property is raising miniature horses, and the plaintiffs also have an arrangement with a beekeeper who has kept hives on the subject property since 2000. It is undisputed that the raising of the miniature horses for sale and the keeping of bees for the production of honey for sale are activities deemed to be agricultural uses pursuant to N.J.S.A 54:4-23.3.
It is not clear precisely when the family began to live at and to raise the horses on the subject property, since there were extensive renovations and new construction at the subject following the plaintiffs’ purchase. There was testimony from Dr. Ketner, a veterinarian, that his practice had been treating the plaintiff’s *43 horses at the subject property for three or four years. In any event, the municipality does not dispute that the subject property had been used for the raising of miniature horses for two successive years immediately preceding the tax year in issue, as required by N.J.S.A. 54:4-23.2.
Similarly, the assessor testified that he was satisfied that the plaintiffs had received sufficient income from their agricultural activities to meet the requirements of N.J.S.A. 54:4-23.5. There was also testimony from the plaintiffs regarding their receipts from the sale of horses and the sale of manure, and it appears that plaintiffs received income from their agricultural activities sufficient to qualify for farmland assessment. Plaintiffs readily conceded, however, that they do not conduct their agricultural activities for the purpose of the income produced. Rather, their decision to conduct the horse-raising operation was a matter of a lifestyle choice: Mrs. Brighton had enjoyed living on a farm as a child, and both plaintiffs believed that living on a farm and raising animals would be beneficial for their children.
Both parties retained surveyors to prepare surveys of the subject property and both surveyors testified at trial. Although the surveys differed slightly as to the total area of the subject, the real disagreement was over which portions of the subject property were devoted to agricultural use and which portions should be considered as land under and used in connection with the farmhouse, and therefore ineligible for inclusion in calculating the total area devoted to agricultural use. See N.J.S.A. 54:4-23.11 and N.J.A.C. 18:15-3.2 (both directing how the total area actively devoted to agricultural use is to be calculated.)
The subject property fronts on Rumson Road, and is surrounded by a post and rail fence and a green wire mesh fence. The miniature horses raised by the plaintiffs are approximately the size of very large dogs and the wire mesh fence was installed for the purpose of keeping the horses on the subject property. Entry to a gravel driveway running through the property is gained from Rumson Road through a locked electric gate on the western side of the property’s southern border on Rumson Road. Visitors must *44 call up to the residence to have the gate opened. The gate can be opened from the house. The driveway continues through a front, wooded area toward the property line on the east, and then past a large front lawn area to the west of the driveway, and then to the residence, which is set back about 400 feet from Rumson Road, and is located about midway between the front and rear property lines. The residence is to the west of the driveway. There is an enclosed patio area in front of the residence that has a fountain and some landscaping. There was testimony to the effect that the horses come into this area and drink from the fountain.
The driveway widens to a gravel parking area to the south and east of the residence, and once past the residence, continues on the eastern side of the property, past a small building used for storage, and then past a one story building described as a guest house and, finally to a two-level barn. Plaintiff Christopher Brighton testified that the storage building is for the personal use of the family and is also used in connection with the farming operations. The bam was described as having three horse stalls, a supply room, and a tack room on one side. On the other side is a garage area, which, according to Mr. Brighton, was built to conform with zoning regulations, which apparently require a garage. Mr. Brighton testified that part of the bam is not actually used as a garage but is used as a gym. At the rear of the property, to the west of the barn, is a fenced paddock area. The bam and paddocks are in close proximity to the northern property line. There are areas of lawn, a fenced swimming pool, a swing set, and a children’s playhouse in between the paddock area and the residence. The paddock is approximately 180 feet from the rear of the residence.
Plaintiffs keep five mares at the subject property, and also keep the mares’ offspring thére for a period of time after birth until they are sold. Both plaintiffs testified that the horses are permitted to run free on the property outside the paddock area two or three or four days a week for a couple of hours each day, depending on Mrs. Brighton’s schedule. Mrs. Brighton testified that she needed to be present when the horses were grazing so that they did not eat too much grass. According to the plaintiffs, *45 particularly Mrs. Brighton, who is most involved in the raising of the horses, the grass on the property is rich, and for health reasons, the horses cannot be permitted to graze constantly on the lawn area. This was confirmed by the testimony of Dr. Ketner, and by the testimony of Joseph Mogar, a breeder of miniature horses.
Mrs. Brighton testified that she seeds the lawns with a pasture mix. However, plaintiffs do maintain the lawns as lawns. They have installed a sprinkler system around the house, and have a lawn maintenance service that comes in and cuts all the grass once a week. In addition to testifying that the horses used the lawn areas for grazing, plaintiffs also testified that the horses used the wooded areas as shade on hot or sunny days. Plaintiffs specifically testified that the horses used the lawn area in front of the residence and the wooded areas. There was no testimony regarding the horses’ use of the property between the driveway adjacent to the residence and the eastern property line.
Although the horses are often confined to the paddock, they regularly have the run of the property, except during the month of July when Mrs. Brighton is away. While she is gone, the horses spend all of their time in the paddock or in the barn, which is directly accessible to the horses from the paddock area, and provides the horses shelter from the sun. Dr. Ketner testified that it was appropriate to keep the horses confined to the paddock, giving them hay and perhaps grain for feed, in lieu of pasture grass. He also conceded on cross-examination that, because the barn was available, the horses did not need the wooded areas of the subject property for shade.
On cross-examination, Mrs. Brighton was asked whether the plaintiffs had held parties for which tents had been erected on the grassy areas where the horses grazed. Mrs. Brighton conceded that there was some overlap between farm use and family use, and that the family had regularly hosted charity events for which tents had been erected. On at least one occasion, the tent occupied an area outside the portion of the property delineated by plaintiffs’ surveyor on his survey map of the subject property as the area *46 associated with the residence, which delineation was sometimes referred to as a “personal use area.” Five hundred people had attended such an event in the summer of 2003. Mr. Brighton also testified that, due to a shortage of soccer fields in Rumson, he permitted the town to use portions of the subject property, outside the areas delineated by his surveyor as personal use areas, for once a week practice for its recreational soccer teams. According to Mr. Brighton, the soccer practices took place in years subsequent to the tax year in issue here. The horses were contained in the paddock area while social or athletic activities were going on.
There was also testimony regarding the keeping of bees for the production of honey on the subject property. Plaintiffs’ beekeeper testified that the plaintiffs contacted her because they were seeking to have beehives installed on the subject property. She inspected the property and determined it was appropriate for the placements of hives because the trees and plantings on the subject and neighboring property looked attractive for bees and because there was adequate water. The first hive was placed there in 2000, and there are presently five hives located on the subject. The hives have been placed in a line, twenty-five to thirty feet across, on the front lawn in front of a wooded area. The hives are eighteen inches wide. Accordingly, the hives occupy an area of about forty-five square feet out of the total area of the subject, approximately 269,000 square feet. Plaintiffs do not receive any cash compensation for permitting the placement of hives on their property. Rather, the beekeeper occasionally supplies them with jars of honey. The cash value of the honey supplied is negligible.
The beekeeper testified that bees do not stay within property limits but go where nectar is available. She stated that they fly three to four miles in search of a nectar source. This testimony differed somewhat from defendant’s witness, who identified himself as a beekeeper and a past president of the New Jersey Beekeepers Association. It was his testimony that bees generally keep within a range of one mile of the hive, but will sometimes go out two miles to a nectar source.
*47 I conclude from the testimony of both witnesses that the bees associated with the hives on the subject property do not stay on the subject, that they seek out favorite sources of nectar and that they are not dependent on the subject property as a source of neetar. There was testimony by Mrs. Brighton that she had planted a clover mix in some lawn areas, but she also testified that a lawn maintenance service regularly cut the grass.
In Barrett v. Borough of Frenchtown, 6 N.J.Tax 558, 564 (1984), the court held that a five acre lot on which beehives were located was not devoted to honey production for purposes of farmland assessment where the bees occasionally foraged for nectar on the subject property, but the bees, to a greater extent, gathered nectar from a wider area. See also, Wyer v. Middletown Tp., 16 N.J.Tax 544, 548 (1997) (holding that a lot seeded with clover was not actively devoted to agricultural activities where there was no evidence that the parcel was needed for the production of honey in hives on a neighboring lot, and where it was probable that the bees foraged on other parcels.)
I similarly find that the subject property is not devoted to the production for sale of bees and apiary products. The area occupied by the hives is negligible, and there was no evidence that the bees stayed on the property. Plaintiffs own witness testified that the bees generally forage within a three or four mile radius from the hives. I conclude that plaintiffs claim for farmland exemption must rest solely on whether the requisite five acres of land was actively devoted to horse-raising activities.
There was a factual dispute as to whether the horses actually used the wooded and front lawn portions of the subject. Defendant’s assessor testified that he frequently drives past the subject property and had never observed the miniature horses on the front lawn. Plaintiff pointed out that the view of the front lawn from the road was partially obscured by hedges and that the assessor would have difficulty seeing the horses from his car. Plaintiffs beekeeper testified that over a four year period, she visited the hives perhaps thirty times a year and that she had seen the horses in the area in front of the residence only once, but had *48 on occasion observed horse manure. A neighbor testified that he had never observed the horses in the wooded areas.[1]
Because the plaintiffs permitted the horses outside the paddock area for a maximum of perhaps eight hours a week, it is not inconceivable that the assessor and other occasional visitors would never see the horses outside the paddock area. Since it was necessary for the beekeeper to call up to the residence so that the gate could be opened, it is also possible that the plaintiffs had sufficient notice to put the horses in the paddock when she arrived at the premises. I find that the horses had the run of the property as testified to by plaintiffs, namely up to four times a week for up to two hours at a time, except during July, when they were contained in the paddock area at all times.
Defendant maintained that even if the horses did have the run of the property, the portion of the property that should be attributed to the personal use of the plaintiffs and their family, when subtracted from the total area of the subject property, left slightly less than five acres. Plaintiffs surveyor used substantially the same subtraction technique, but concluded that slightly more than five acres were available for the horses. The surveyors each prepared survey maps of the subject property delineating the areas devoted to the use and enjoyment of the farmhouse and related areas. Each surveyor subtracted that amount from the total area of the subject to arrive at the area remaining for agricultural use.
N.J.S.A. 54:4-23.11 provides:
In determining the total area of land actively devoted to agricultural or horticultural use there shall be included the area of all land under barns, sheds, seasonal farm markets selling predominantly agricultural products, seasonal agricultural labor housing, silos, cribs, greenhouses and like structures, lakes, dams, ponds, streams, irrigation ditches and like facilities, but land under and such additional land as may be actually used in connection until the farmhouse shall be excluded in determining such total area.
[Emphasis added].
*49 The Director of the Division of Taxation has also promulgated regulations setting forth how the land area actively devoted to agricultural use is to be calculated.
In determining the area ol' such land, all the land under barns, sheds, seasonal farm markets selling predominantly agricultural products, seasonal agricultural labor housing, silos, cribs, greenhouses and like structures, lakes, dams, ponds, streams, irrigation ditches and like facilities is included, but land under the farmhouse, and such additional land as may be actually used in connection with the farmhouse, including, but not limited to, land used for laums, flower gardens, shrubs, swimming pools, tennis courts and for like pmposes, is excluded in determining the total area.
[N.J.A.C. 18:15-3.2 (emphasis added)!.
See also, N.J.A.C. 18:15-4.4 (providing that the land under a farmhouse and such additional land related to the use and enjoyment of the farmhouse are not deemed to be in agricultural use.)
Plaintiffs’ surveyor, Charles Bell, personally surveyed the subject property in June 1998 at the time plaintiffs purchased the property. Mr. Brighton retained Mr. Bell to revise the survey following the renovations and improvements to the property. The revision was completed in 2001. Mr. Bell did not personally visit the property for the revision, but had a crew go out to take the appropriate measurements. Accordingly, he had no personal knowledge as to the placement of the improvements, the shrubbery and other landscaping, and he had no personal knowledge as to the actual use of the property.
Mr. Bell testified that he drew in a shaded area on his 2001 suivey which he attributed to the personal use of the plaintiffs and their family. In calculating the area devoted to agricultural use, he excluded from the total acreage the driveway, the parking areas, the house and a buffer around the house, the area between the house and the pool, the pool itself, and the fenced area surrounding the pool, the guesthouse and the playhouse. On cross-examination, Mr. Bell was asked about the buffer around the house. He testified that he used a ten to fifteen foot buffer, but conceded that he allowed for no buffer around the front patio. He was also asked why he had not included the area behind the guesthouse and the other property between the driveway and the eastern property line within the area used by the residents. Mr. Bell responded that he had been told that the property was being *50 used for farm purposes. As noted above, there was no specific testimony regarding the use of that area of the property by the horses.
Mr. Bell conceded that, pursuant to his calculations, the property devoted to agricultural use exceeded five acres by only about 2000 square feet. He admitted that if he had included the areas east of the driveway adjacent to the residence or the area behind the guesthouse in the area delineated as associated with the farmhouse, the area devoted to agricultural use as shown by his calculations would have been less than the five acres required by statute. He nevertheless insisted that he had drawn the lines the way he had in accordance with the personal use of the property by the human occupants.
Defendant’s surveyor, Richard Moralle, testified that he had been given instructions to prepare an independent boundary and topographic survey. He used the Bell survey as a reference document. Mr. Moralle did not personally visit the property but, like Mr. Bell, relied on a field crew. He testified that the Bell survey did not seem to have any standard as to where the lines were drawn to delineate the areas associated with the residence. He testified that he had had two discussions with the assessor, and that he had suggested to the assessor that minimum setbacks under the zoning ordinance be used to define the accessory areas, such as the guesthouse. By using these setbacks, Mr. Moralle included a greater area as associated with the residence or farmhouse, and an area less than five acres remained after subtracting the farmhouse area from the total area. It does appear under the relevant ordinances that a fifteen-foot setback is required for accessory buildings. Moreover, according to defendant, if the entire subject property is, in effect, a paddock for the horses, the zoning ordinance requires a fifteen-foot setback around the entire perimeter, because “paddock” is an accessory use. The defendant asserts that the fifteen-foot border around the property must be excluded from the area claimed to be devoted to agricultural use, thereby making available significantly less than the five acres required by the statute.
*51 This court has previously determined that property actually used for agricultural purposes cannot be excluded in calculating whether the five acre minimum area qualifying for farmland assessment has been met merely because the agricultural use might violate the zoning ordinance. In White v. Borough of Bernardsville, 9 N.J.Tax 110 (1986), aff'd, 9 N.J.Tax 122 (App.Div. 1987), the court held:
[I]f plaintiffs’ use is permitted and in accord with applicable requisites, farmland assessment must follow. This does not interfere in any way with defendant’s authority to set minimum zoning requirements as to various building setbacks. If violation of a setback requirement is claimed, the taxing district is free to seek compliance with its zoning ordinance in the appropriate forum. Assessment at farmland value does not interfere or conflict with this process____ Not every zoning violation, however minor, can be used to deny otherwise appropriate constitutional farmland assessment.
[Id. at 117].
See also, Byram Tp. v. Western World, Inc.,111 N.J. 222, 237, 544 A.2d 37, 44 (1988) (“[T]he Farmland Assessment Act requires that farmland assessment be granted to property actively devoted to agricultural or horticultural activity as statutorily defined in the absence of any proper adjudication that the use of such property is itself unlawful.”). The same reasoning is equally applicable here. The defendant does not dispute that its zoning ordinance permits the subject to be used for raising horses. If five acres of the subject property is in fact actively devoted to agricultural use, it is entitled to farmland assessment.
Although Mr. Bell’s survey is a more accurate representation of what areas may legally be included in calculating whether the five acre minimum for farmland assessment has been met, I find neither survey map to be a reliable representation of the portion of the subject property actually used in connection with the residence, as set forth in N.J.S.A. 54:4-23.11, N.J.A.C. 18:15-3.2(b) and N.J.A.C. 18:15-4.4. Neither surveyor had personally viewed the property for the purpose of delineating the areas of the property associated with the residence, and neither had any personal knowledge as to how the property was used.
Even if I were to accept Mr. Bell’s survey as conclusive on the issue of how much land was associated with the residence, I *52 still conclude that there is less than five acres of the subject property actively devoted to agricultural purposes. With the exception of the paddock area and the land under that portion of the barn used by the horses, and the forty-five or so square feet on which the beehives sat, I find that no other portion of the subject was actively devoted to horse-raising or other agricultural activities.
It is well settled that the assessment made by the assessor is presumed to be correct and that the taxpayer has the burden of proving entitlement to farmland assessment. Miele v. Jackson Tp., 11 N.J.Tax 97, 99 (App.Div.1989). Land qualifying for farmland assessment is assessed based on the value that the property has for agricultural or horticultural use, N.J.S.A. 54:4-23.2, rather than its value for some other use worth more in the marketplace, such as, for example, residential or other development. Because farmland assessment affords preferential tax treatment, it departs from the fundamental principle that all property shall bear its fair share of the public burden of taxation. Alexandria Tp. v. Orban, 21 N.J.Tax 298, 303 (2004) (citing numerous cases). This preferential treatment is substantially similar to an exemption from taxes, and the Act is therefore strictly construed against the party seeking the tax benefits of the Act. Van Wingerden v. Lafayette Tp., 18 N.J.Tax 81, 94 (1999), aff'd, 19 N.J.Tax 205 (App.Div.2000); Wyer v. Middletown Tp., 16 N.J.Tax 544, 546 (1997); Wishnick v. Upper Freehold Tp., 15 N.J.Tax 597, 606 (1996).
Although there is no explicit “main object test” in the Act, Sinopoli v. Borough of Rumson, 19 N.J.Tax 334, 340 (2001), aff'd, 20 N.J.Tax 235 (App.Div.2002), the courts of this State have applied a dominant use test. In City of East Orange v. Livingston Tp., 102 N.J.Super. 512, 246 A.2d 178 (Law Div.1968), aff'd o.b. per curiam, 54 N.J. 96, 253 A.2d 546 (1969), former Justice (then Judge) Handler rejected a claim that a municipal watershed was eligible for assessment as farmland, where the property consisted of woodland and pasture, and was used for the growing and sale of hay, timber and cordwood from which the municipal *53 owner derived income exceeding the amount required to be eligible for farmland assessment. Justice Handler concluded that the statutory phrase “actively devoted to agricultural or horticultural use” contained in N.J.S.A. 54:4-23.2, “must be understood in its usual significance and in a manner which will sensibly effectuate the salient statutory objective of providing tax relief with respect to lands committed to farming.” Id. at 536-37, 246 A.2d at 191. Although there can be multiple uses of land, one use is generally dominant. Id. at 537, 246 A.2d at 191. Where the agricultural use is subservient to the dominant use, the property is not “devoted” to the agricultural use. Ibid. See also, Mt. Hope Mining Co. v. Tp. of Rockaway, 8 N.J.Tax 570, 579 (1986) (explaining that when agricultural use is not the dominant use, land is not actively devoted to agricultural use); Green Pond Corp. v. Tp. of Rockaway, 2 N.J.Tax 273, 289, 291 (1981) (explaining that although both agricultural and nonagricultural uses of a parcel will not disqualify the parcel for farmland assessment, the agricultural use must predominate for the property to qualify for farmland assessment).
As conceded by Mrs. Brighton, there was “overlap” between the family’s use of the property and the horses’ use of the property. There were parties and recreational activities on property outside the area delineated by Mr. Bell as land used in connection with the farmhouse. Mr. Brighton testified that one large party and particular soccer practices took place in years subsequent to the tax year in issue. There was no specific testimony as to the particular tax year in issue here, but I do not find it credible that plaintiffs, their children, and their guests confined themselves inside the lines drawn by Mr. Bell as representative of the area associated with the farmhouse only during tax years subsequent to the one in issue.
More significantly, the horses used the property for only a limited time each week, and the testimony of the veterinarian confirmed that the lawns and the woods of the subject were unnecessary for the well-being of the horses. Their time outside the paddock was dictated by Mrs. Brighton’s schedule and not by any agricultural need. The horses never had the run of the *54 property in July and according to the testimony of plaintiffs’ veterinarian, it was appropriate to keep the horses in the paddock, where the bam afforded them shelter from the sun and heat.
In particular, I find that the wooded area (which appears from the survey maps to constitute a little more than an acre of the subject), far from being devoted to agricultural use, was hardly ever used by the horses. Because the horses only used the woods for shade on hot or sunny days and did not use that area of the property at all during one of the summer months, I conclude that there was virtually no agricultural use of the wooded area.
I conclude that the plaintiffs have failed to establish that the agricultural use of at least five acres of the subject property was the dominant use. It is only when the agricultural use is the dominant use that the property is eligible for assessment as farmland. Mt. Hope Mining Co., supra, 8 N.J.Tax at 579; Green Pond Corp., supra, 2 N.J.Tax at 289. Although it is clear that the paddock and part of the bam are actively devoted to the raising of horses, and that the house and areas immediately surrounding the house are used for residential purposes, I conclude that the bulk of the property is occasionally used by the family, and occasionally used by the horses, but, for the most part, is not actually devoted to anything.
This case is readily distinguishable from Sinopoli supra, 19 N. J.Tax 334, in which the court determined that the entire area of an estate, other than areas with an impervious covering, could be used in calculating the five acre minimum requirement, where there was no evidence that any of the area delineated on the taxpayer’s survey map as devoted to horticultural use was used for anything else. Id. at 341. Moreover, there was ample testimony that the open lawn area of the estate was necessary for the light and drainage necessary for the trees and flowers that were being harvested and sold. Id. at 339. The court concluded that horticulture was the dominant use of the property. Ibid. The evidence is to the contrary in the present case. Such use of the bulk of the property as is made by the horses is unnecessary for their health and well-being.
*55 Plaintiffs also rely on White v. Borough of Bernardsville, supra, 9 N.J.Tax 110, in which the court determined that a 5.58 acre parcel was eligible for farmland assessment, even after deducting the house, deck, pool, driveway, and parking areas. The court found credible the taxpayer’s detailed testimony regarding the intensive agricultural use of the remaining area of the property, id. at 118-20, and concluded that the dominant use of the land was agricultural and not residential. Id. at 121. By contrast, the woods and lawn areas oí the subject property in this case were very lightly used.
For the foregoing reasons, I conclude that the plaintiffs have failed to establish that a minimum of five acres of the subject property is actively devoted to agricultural use. The property fails to meet the statutory requirements for assessment as farmland, and the judgment of the Monmouth County Board of Taxation is affirmed.

That neighbor had a history of disputes with the plaintiffs and had a demonstrable animosity towards them at trial. I accordingly give his testimony little weight.