NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Patrick DeAlmeida**
 **Presiding Judge**

R.J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
(609) 815-2922 x54620

December 28, 2017

Andrea Wyatt, Esq.
Gilmore & Monahan, P.C.
10 Allen Street
Toms River, New Jersey 08754

Jeff Horn, Esq.
Horn Law Group, LLC
801 A Main Street
Toms River, New Jersey 08753

> Re:    Sam S. Russo v. Township of Plumsted
>           Docket No. 015983-2012
>           Docket No. 010713-2013
>           Docket No. 010167-2014

Dear counsel:

This letter constitutes the court's opinion after trial in the above-referenced matters. At issue is whether plaintiff's real property qualified for farmland assessment for local property tax purposes for tax years 2012, 2013, and 2014. For the reasons stated more fully below, the court concludes that for tax year 2012 plaintiff did not prove by a preponderance of the evidence that the dominant use of the subject property was agricultural or horticultural on the relevant valuation date. The court, therefore, affirms the Judgment of the Ocean County Board of Taxation denying

farmland assessment for that tax year. With respect to tax years 2013 and 2014, while the municipality concedes that the predominant use of the subject property for those years was agricultural or horticultural, the controlling statute requires that property be actively devoted to such uses for two consecutive years before qualifying for farmland assessment. The court's decision with respect to tax year 2012, therefore, precludes farmland assessment of the subject property for tax years 2013 and 2014. As a result, the Judgments of the Ocean County Board of Taxation denying farmland assessment for those tax years will also be affirmed.

I. Findings of Fact and Procedural History

The following findings of fact and conclusions of law are based on the evidence introduced at trial.

These matters concern an approximately 100-acre parcel owned by plaintiff Sam S. Russo in defendant Plumsted Township. The property is designated in the records of the municipality as Block 58, Lot 13, and is commonly known as 27 Hopkins Lane.[1]

Plaintiff purchased the property in 1998 and began farming activing on the parcel shortly thereafter. The municipal tax assessor granted farmland assessment for the subject property beginning in tax year 2000. This treatment remained in place through tax year 2010. The farm is operated under the name Suzie Q Farms. At trial, plaintiff claimed that he could not explain whether Suzie Q Farms is a corporate entity, a partnership, or merely a trade name. A check admitted into evidence is drawn on an account in the name of Suzie Q Russo, LLC. It is not clear whether this is the entity that operates the farm at the subject property.

---

[1]     Plaintiff also owns two parcels, Block 58, Lot 14, and Block 61, Lot 14, which are included in the approximately 100 acres assessed under Block 58, 13.

Plaintiff submitted an application to the assessor for farmland assessment of the subject property for tax year 2011. The application indicates that the property consists of 80 acres of harvested cropland, 20 acres of appurtenant woodlands, and 2 acres associated with a farm residence. Reference to a farm residence in the application contradicts plaintiff's testimony that the only residence on the property was destroyed by fire in 2007.

The tax year 2011 application allocates the 80 acres of harvested cropland as 20 acres of corn for feed to livestock, and 60 acres of rye mulch used for livestock bedding and for sale by plaintiff. In addition, plaintiff completed a supplemental farmland application for tax year 2011 indicating $3,000 in receipts from rye straw. The supplemental application indicates 30 acres of woodland, in contradiction to the initial application that indicates 20 acres of woodland. Plaintiff conceded at trial that at no time did he have a woodlands management plan for any portion of the subject property.

The tax year 2011 application leaves blank all entries for livestock. Plaintiff testified that there was a significant amount of livestock on the subject property at the time that he completed the application that he did not list because, after discussions with the tax assessor, he was under the impression that the subject property qualified for farmland assessment because of the crops grown there. In addition, plaintiff testified that he "did not want to draw any attention to" the farm by reporting livestock on the application. It is not clear what plaintiff meant by that statement.

The tax assessor testified that she granted farmland assessment for tax year 2011 to only 10 acres of the subject property. She based this determination on her conclusion that plaintiff was using the subject property for a number of non-agricultural and non-horticultural commercial and recreational uses, that were, in the assessor's view, progressively overwhelming farming activity on the property. The assessor admits that she did not inspect the property prior to making the tax

3

year 2011 determination and based her decision on written reports of various government and regulatory agencies detailing non-farming activities on the property. Those reports were neither introduced at trial nor identified in any detail. Nor did the assessor identify which of the 10 acres qualified for farmland assessment or explain how she estimated the qualified acreage.

Plaintiff testified that he did not notice the reduction of farmland assessment to ten acres for tax year 2011 or the resulting increase in taxes on the parcel. He therefore did not challenge the assessor's decision. As a result, the tax year 2011 assessment on the subject property is not before the court.

Plaintiff thereafter applied for farmland assessment for the subject property for tax year 2012. Plaintiff's application reported 60 acres of harvested cropland, 30 acres of appurtenant woodlands, 6 acres used for boarding and training horses, and 10 acres not devoted to agricultural or horticultural use. There is no mention of a farm residence on the application. The form reported a total of 106 acres, three more than were reported the prior year. Plaintiff explained this difference as the result of "rough estimates" he made for the applications. There is no supplemental application indicating the amount of revenue earned on the subject property from farming activity for tax year 2012. No evidence was admitted at trial on this point, other than plaintiff's testimony that the farm income earned in 2012 was consistent with the farm income earned in the prior year.

The tax year 2012 application allocates the 60 acres of harvested cropland as 20 acres of corn for silage, 60 acres of rye, and the same 60 acres with a backup crop of soy. The 20 acres of corn for silage also are encompassed in the 60 acres. An additional 2 acres are listed as a tree and shrub nursery. The application also lists 12 head of cattle, 3 horses and ponies, 23 sheep, 90 swine, 3 goats, and 25 chickens as livestock present at the subject property.

The tax assessor did not inspect the property in response to the tax year 2012 application. She instead reviewed the reports of various government and regulatory agencies detailing non-farming activities on the property, and reached the conclusion that the dominate use of the subject property was not an agricultural or horticultural use for tax year 2012. The reports on which the tax assessor relied were not identified with precision or offered into evidence. It is not clear if the reports on which the tax assessor relied for her tax year 2012 determination were the same reports she relied on for her tax year 2011 determination.

Plaintiff filed a Petition of Appeal with the Ocean County Board of Taxation challenging the assessor's denial of farmland assessment for the subject property for tax year 2012.

On July 31, 2012, the county board of taxation issued a Judgment affirming the assessor's decision.

On September 5, 2012, plaintiff filed a Complaint in this court challenging the county board Judgment for tax year 2012.

Plaintiff thereafter applied for farmland assessment for the subject property for tax year 2013. The tax year 2013 application lists 40 acres of cropland harvested, 25 acres of cropland pastured, 20 acres of appurtenant woodlands, and 15 acres not actively devoted to agricultural or horticultural uses, for a total of 100 acres. Plaintiff identified all 40 acres of harvested cropland as dedicated to corn for silage. In addition, the tax year 2013 application identified 2.5 acres for boarding, 2 acres for rehabilitating, and 1 acre for training horses.

The tax year 2013 application identified 76 beef cattle, 3 dairy cows, 3 young dairy cows, 10 horses and ponies, 40 sheep, 30 swine, 2 ducks, 12 goats and 40 chickens as the livestock on the subject property. A supplemental application for farmland assessment for tax year 2013

5

reported the sale of 22 hogs and 4 sheep, each at $100 a head, and one steer at $1,000, for total receipts of $3,600.

The tax assessor again did not visit the subject property in response to the tax year 2013 farmland assessment application. She determined, however, that the dominate use of the property had returned to an agricultural or horticultural use. However, because farmland assessment is predicated on an active devotion of the subject property to an agricultural or horticultural use for two successive years immediately preceding the tax year at issue, the tax assessor denied farmland assessment for tax year 2013 based on her denial of farmland assessment for tax year 2012. See N.J.S.A. 54:4-23.2.

Plaintiff filed a Petition of Appeal with the Ocean County Board of Taxation challenging the assessor's denial of farmland assessment for the subject property for tax year 2013.

On May 1, 2013, the county board of taxation issued a Judgment affirming the assessor's decision.

On June 24, 2013, plaintiff filed a Complaint in this court challenging the county board Judgment for tax year 2013.

Plaintiff thereafter applied for farmland assessment for the subject property for tax year 2014. The tax year 2014 application lists 40 acres of cropland harvested, 25 acres of cropland pastured, 20 acres of appurtenant woodlands, 9 acres dedicated to the boarding and rehabilitation of horses, and 10 acres not actively devoted to agricultural or horticultural uses, for a total of 104 acres. Plaintiff did not identify what crops were harvested on the harvested cropland.

The tax year 2014 application identified 90 beef cattle, 1 dairy cow, 30 sheep, 40 swine, 7 goats, and 20 chickens as the livestock on the subject property. The application lists "0" horses and ponies, which appears to contradict the allocation of 9 acres to the boarding and rehabilitation

6

of horses.  Plaintiff did not submit a supplemental application listing farming receipts for tax year 2014.

The tax assessor again did not visit the subject property in response to the tax year 2014 farmland assessment application.  She determined, however, that the dominate use of the property was an agricultural or horticultural use.  However, because farmland assessment is predicated on an active devotion of the subject property to an agricultural or horticultural use for two successive years immediately preceding the tax year at issue, the tax assessor denied farmland assessment for tax year 2014 based on her decision to deny farmland assessment for tax year 2012.  See N.J.S.A. 54:4-23.2.

Plaintiff filed a Petition of Appeal with the Ocean County Board of Taxation challenging the assessor's denial of farmland assessment for the subject property for tax year 2014.

On May 1, 2014, the county board of taxation issued a Judgment affirming the decision of the assessor.

On May 9, 2014, plaintiff filed a Complaint in this court challenging the county board Judgment for tax year 2014.[2]

The matters were tried together over two days.

---

[2]    The tax year 2012 Complaint alleges both that the subject property is entitled to farmland assessment and, in the event that farmland assessment is denied, the assessment on the property exceeds its true market value.  The tax year 2013 and tax year 2014 Complaints allege only that the assessment on the subject property exceeds its true market value.  Those Complaints do not mention farmland assessment.  At trial, the parties acknowledged that they were operating under the understanding that the taxpayer sought farmland assessment for the subject property for all three tax years, and did not challenge the quantum of the assessment on the property for any of the three tax years.  In light of the absence of an objection from the municipality, the court issued a bench opinion in which it announced that it considered the Complaints and Case Information Statements in each of the matters to be amended to indicate that plaintiff challenged only the denial of farmland assessment for each of the three tax years at issue.

7

Given the unusual circumstances that gave rise to the Complaints, it is necessary for the court to decide only if plaintiff has established the statutory criteria for farmland assessment for the subject property for tax year 2012. This is the only tax year for which the assessor determined that the dominate use of the property was a use other than an agricultural or horticultural use. The tax assessor concedes that the subject property's dominant use for tax years 2013 and 2014 returned to an agricultural or horticultural use. She denied farmland assessment for those tax years only because N.J.S.A. 54:4-23.2 requires an active devotion of the subject property to an agricultural or horticultural use for two successive years immediately preceding the tax year for which farmland assessment may be granted. If the court determines that the subject property qualifies for farmland assessment for tax year 2012, then the property also will qualify for farmland assessment for tax years 2013 and 2014. On the other hand, if the court determines that the subject property was not actively devoted to an agricultural or horticultural use for tax year 2012, then the property also will not qualify for farmland assessment for tax years 2013 and 2014.

It is evident that the subject property was put to multiple uses on October 1, 2011, the relevant valuation date for tax year 2012. Plaintiff used the property for farming, and housing livestock. In addition, plaintiff used the property for his commercial trucking and scrap-hauling business, operated a car repair and restoration business on the property, permitted the construction and use of a motocross track in a corner of the property, and dumped truckloads of soil from a highway construction project on the property. These commercial uses took place on the subject property simultaneously with the agricultural or horticultural uses, with little effort to distinguish between the farming and commercial operations, and, as far as the court can tell, no detailed record keeping.

8

The taxpayer's case was presented largely through the testimony of Mr. Russo. The court found Mr. Russo's testimony to lack credibility in many regards. For example, when testifying with respect to the auto restoration and repair business on the property, Mr. Russo was vague, evasive, and contradicted himself. On other topics, Mr. Russo professed a surprising lack of knowledge about the details of the business entities operating on the subject property. Moreover, the trial record is notable for what was not admitted into evidence. Plaintiff offered the scantest of business records establishing the financial details of agricultural or horticultural activity on the subject property. The record contains no ledger, balance sheet, tax records, bank statements, or other documents detailing the income and expenses associated with farming activities on the subject property. This is a crucial omission, given the multiple ways plaintiff used the subject property, including for the dumping of soil and the storage of heavy equipment associated with a commercial entity that earned between $500,000 to $1.5 million during the year in question, and the legal precedents requiring a taxpayer seeking farmland assessment to establish that the dominate use of a parcel is agricultural or horticultural. The various ways that plaintiff used the subject property are discussed in turn:

1.    Agricultural and Horticultural Uses.

Aerial photographs of the subject property and testimony establish that there are large fields on the parcel that appear to be suitable for use as cropland. In addition, the property is improved with several barns and paddocks that appear to be amenable to housing and penning animals. The tax assessor testified that she agreed that the subject property was used, in part, to house and pen livestock, but that the amount of livestock listed on plaintiff's tax year 2012 application was exaggerated. That application reports a large amount of livestock on the subject property, including 12 cattle, 90 swine, 23 sheep, and 3 horses and ponies.

9

The court could not detect a single animal on the two aerial photographs of the subject property admitted into evidence. Although the photographs appear to have been taken from some distance above the subject property, paddocks and other areas for penning animals are easily identified, and cows, horses and swine would likely be detectable if present. Mr. Russo provided no detailed testimony with respect to the number of livestock on the subject property. He offered no log or other records cataloguing livestock on the property. Plaintiff introduce two handwritten pages from a spiral notebook that he testified were notes of ear tags placed on livestock born on the subject property. In addition, the record contains evidence of a $595 veterinarian bill paid in 2011 by Suzie Q Farms, as well as a $250 veterinarian bill paid that year by plaintiff. In addition, the record contains a receipt for $1,800 in soybean seed purchased by Mr. Russo in 2011.

Plaintiff also produced three check ledger entries from 2011 and 2012 from the records of Sam S. Russo, Inc., a company operated by Mr. Russo. Plaintiff described Sam S. Russo, Inc., as a "roll off entity," that removes solid waste by truck and dumpster. Although the actual checks are not in the record, two of the ledger entries appear to be for the purchase of cattle. The third entry has no description of the transaction. One entry includes a credit for lumber. Mr. Russo could only give his "best guess" with respect to the transactions reflected in these entries, including the meaning of the lumber credit.

Other records admitted into evidence include a log of sales from an Agway dealer to Mr. Russo for various items that appear to be related to farming and livestock, a receipt for the repair of a boiler, and receipts for payments to a veterinarian in 2012. Notably, the payments to the veterinarian were made by check from Suzie Q Russo, LLC, an entity not mentioned by Mr. Russo during his testimony, and for which no other business records were admitted at trial. One payment

10

to a veterinarian was made by a check drawn on what appears to be Mr. Russo's personal bank account.

Plaintiff introduced no detailed records of the planting, harvesting, sale, or use of any crop on the subject property. Nor does the record contain any evidence with respect to the boarding and training of horses. Plaintiff introduced no evidence with respect to the planting, maintenance, or harvesting of trees or shrubbery from the nursery listed on the tax year 2012 farmland application.

There is sufficient evidence in the record on which to conclude that livestock was present at the subject property on the relevant valuation date. The handwritten log of ear tags is credible evidence that a number of animals were present on the subject property. This is corroborated by receipts for payments to veterinarians and evidence of the purchase by plaintiff of items that appear to be related to livestock. It is not possible, however, to make a more detailed finding with respect to the amount of livestock at the property, or the income generated from the livestock. There is no credible evidence establishing receipts from the sale of livestock from the entity that operated the farm to any purchaser.

Nor does the record contain credible evidence establishing the nature or extent of any other agricultural or horticultural uses of the subject property. While there is a receipt in the record of the purchase of soybean seed, plaintiff introduce no evidence with respect to the planting, harvesting, and use of soybeans, or any other crop. Nor does the record contain any evidence of the income realized from the sale of soybean or any other crop. In fact, Mr. Russo testified that he does not recall the amount of farm-related income earned from the subject property in 2012. He was certain, however, that he earned enough to meet the statutory requirement for farmland assessment. Without a shred of corroborating evidence, Mr. Russo's vague testimony is an

insufficient basis for a finding with respect to the farming income realized from the subject property.

2.      Motocross Track.

The record establishes that a corner of the subject property was converted to a motocross track after the removal of trees by plaintiff.   Mr. Russo admitted that this portion of the property was used by his son and others to ride motorized bikes.  The motocross track was in close proximity to a residential area abutting the subject property.  Noise from the bikes provoked complaints from neighbors, which, in turn, brought regulatory scrutiny to the farm, including from the Department of Environmental Protection ("DEP").

The record suggests that plaintiff's removal of tress in the area of the motocross track resulted in a wetlands disturbance.  The DEP took action against plaintiff, which, ultimately resulted in what appears to be wetlands remediation in the area of the motocross track.  Mr. Russo professed not to know the details of the DEP regulatory action and described his creation of new wetlands in the area as, in effect, a favor to a DEP official who visited the property and wanted to create a habitat for turtles.

Mr. Russo's attempt to characterize the removal of trees and creation of a motocross track as an agricultural use was entirely lacking in credibility.  He first testified that he removed the trees in order to generate income after the residence at the subject property was destroyed by fire in 2007.  He subsequently testified that the trees might have been used in a furnace to warm the barns. He thereafter testified that he removed the trees as part of a plan to convert the land beneath the trees to agricultural use.  There is nothing in the record suggesting that the removal of trees and creation of a motocross track was for any purpose other than to create a recreational space for Mr.

12

Russo's son and others. This portion of the subject property certainly was not used for agricultural or horticultural purposes.

3.    Scrap Storage.

Mr. Russo allowed a decommissioned and dismantled amusement park ride from Six Flags Great Adventure to be stored on the subject property during the relevant period. Plaintiff's friend obtained the contract to remove the Batman and Robin Chiller ride from the amusement park. Mr. Russo permitted the pieces of the dismantled ride to be stacked on the subject property for more than two years. The amount of metal attributable to the ride was not insubstantial. The long pile of red metal, running along the main entrance to the property, was readily apparent on an aerial photograph admitted into evidence. While plaintiff did not own the remains of the decommissioned ride, he believed that if he allowed the components of the ride to remain on his property long enough they would eventually come into his possession, allowing him to convert the material as scrap metal at a profit.

4.    Truck/Dumpster Storage.

A noted above, plaintiff owned and operated Sam S. Russo, Inc., which was involved in land clearing, site work, lawn maintenance, and materials hauling. During the relevant period, the company had one truck and 60 dumpsters. Mr. Russo conceded that the truck and dumpsters, when not being used by Sam S. Russo, Inc., were stored at the subject property. According to Mr. Russo, the company did not pay rent to store its equipment at the subject property. Although Mr. Russo testified that the dumpsters, while present at the subject property, were filled with farm waste and other debris associated with the operation of Suzie Q Farms, he offered no evidence to support his testimony.

13

5.      Importation of Soil.

Sam S. Russo, Inc. obtained a contract for hauling low PH soil from construction sites associated with the New Jersey Turnpike. The company's trucks hauled the soil to the subject property, where it was dumped in a field. The dumped materials can easily be identified as a significant portion of the subject property in an aerial photograph admitted as evidence. According to Mr. Russo, "the engineer" at the construction sites told Mr. Russo that the DEP had approved use of the soil to enhance the value of the existing soil at the subject property. Mr. Russo claimed that this use of the construction site soil constitutes an agricultural or horticultural use of the portion of the subject property on which it was dumped.

The DEP objected to the dumping of the Turnpike soil on the subject property and ordered that the materials be diverted to another site. Although the dumping of the soil on the subject property stopped, plaintiff did not remove the soil placed there prior to the DEP's diversion order.

Plaintiff testified that he earned approximately $500,000 from hauling materials from the New Jersey Turnpike site to the subject property. He also testified that he lost another approximately $500,000 in profits as a result of the diversion of materials from the Turnpike to another site.

6.      Classic Muscle Car Restoration, Inc.

When Mr. Russo first identified one of the barns on the subject property, he testified that "a friend of mine stores cars in there." On cross-examination, however, it was revealed that an entity entitled Classic Muscle Car Restoration, Inc. operates out of the barn, which contains 8 to 10 car lifts, a paint spray booth, a Freon air conditioning machine, tool boxes, welders, racks, and diagnostic computers necessary for car repair and restoration. Mr. Russo attempted to minimize

14

this equipment as evidence of a car restoration hobby that he and his acquaintance, Tony, engage in at the subject property.

This characterization of what transpires in the barn was contradicted several times by Mr. Russo's testimony. He testified that if a car owner contacted Tony to repair or restore a car, the requested work would be done on the subject property and "we would charge" for the service and parts. Mr. Russo then backtracked and testified that he did not charge for any work done to cars at the subject property, but Tony did. He thereafter testified that any income from the car repair and restoration work was "inconsequential," although he did not explain how he would know that if he was not involved in charging Tony's customers.

In addition, Mr. Russo testified that he owned a building at another location at which "my car shop" was located before it moved to the subject property and that "it's like having my own mechanics shop on the property." When asked who owns the car repair and restoration equipment, Mr. Russo responded: "I would say that all of the equipment in the barn is mine, but if Tony wants to use it, he could take it" and then "I would say Tony owns it and he's going to will it to me. He's going to walk away from it. It's my understanding." Mr. Russo admitted that he does not get billed by Tony for repair work Tony performs on the subject property on Mr. Russo's personal vehicles, but that he compensates Tony with meals.

Mr. Russo also claimed that the equipment in the barn was used to repair and paint tractors. He offered no evidence to support this assertion.

In 2009, the municipality served plaintiff with a Notice of Violation and Order to Terminate. The Notice and Order cited the illegal construction of a paint spray booth and operation of an auto body shop within an existing agricultural building without a permit. The outcome of

this Notice and Order is not in the record, although Mr. Russo testified that no action was taken by the municipality after issuance of the Notice and Order.

## II. Conclusions of Law

Pursuant to the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1, et seq. (the "Act") and paragraph 1(b) of Article VIII, Section 1 of the New Jersey Constitution, eligible farmland is assessed at a lower standard than other lands in the State. See New Jersey State League of Municipalities v. Kimmelman, 105 N.J. 422, 437 (1987). The Constitutional provision permitting preferential treatment of farmland was enacted in the 1963 general election. "Preserving New Jersey's Forestland Through the Farmland Assessment Act," 17 Rutgers L.J. 155 (1985). The primary goal of the constitutional amendment and the Act was "to preserve the 'family farm' by providing farmers with some measure of economic relief by permitting farmland to be taxed based on its value as a continuing farm and not on any other basis." Hovbilt, Inc. v. Township of Howell, 138 N.J. 598, 619 (1994); accord Van Wingerden v. Township of Lafayette, 303 N.J. Super. 614, 618 (App. Div. 1997); Urban Farms, Inc. v. Township of Wayne, 159 N.J. Super. 61, 67 (App. Div.), certif. denied, 78 N.J. 330 (1978). "Other benefits such as the maintenance of open spaces and the preservation of the beauty of the countryside, although incidental to the principal objective, were also significant factors in the passage of the amendment." Hovbilt, supra, 138 N.J. at 619 (citing Township of Andover v. Kymer, 140 N.J. Super. 399, 404 (App. Div. 1976) and Township of Galloway v. Petkevis, 2 N.J. Tax 85, 91 (Tax 1980)).

According to the Farmland Act,

> the value of land, not less than 5 acres in area, which is actively devoted to agricultural or horticultural use and which has been so devoted for at least the 2 successive years immediately preceding the tax year in issue, shall, on application of the owner, and approval

thereof as hereinafter provided, be that value which such land has for agricultural or horticultural use.

[N.J.S.A. 54:4-23.2.]

The Act provides that land

shall be deemed to be in agricultural use when devoted to the production for sale of plants and animals useful to man, including but not limited to . . . grains and feed crops . . . poultry . . . livestock, including beef cattle, sheep, swine, horses, ponies . . . . .

[N.J.S.A. 54:4-23.3.]

The Act also contains a financial requirement for land to qualify for farmland assessment:

[L]and, five acres in area, shall be deemed to be actively devoted to agricultural or horticultural use when the amount of the gross sales of agricultural or horticultural products produced thereon . . . have averaged at least $500.00 per year during the two-year period immediately preceding the tax year in issue . . . .

In addition, where the land is more than five acres in area, it shall be deemed to be actively devoted to agricultural or horticultural use when the amount of the gross sales of agricultural or horticultural products produced on the area above five acres . . . have averaged at least $5.00 per acre during the two-year period immediately preceding the tax year in issue . . . .

[N.J.S.A. 54:4-23.5.][3]

Because farmland assessment represents a departure from the general principle that all property bear its fair share of the public burden of taxation, the Act, which accords treatment equivalent to a partial tax exemption, is construed against the party seeking preferential treatment. Van Wingerden v. Township of Lafayette, 18 N.J. Tax 81, 94 (Tax 1999), aff'd, 19 N.J. Tax 205 (App. Div. 2000). In addition, the assessor's determination denying a farmland application is

---

[3]    N.J.S.A. 54:4-23.5 was amended, effective April 15, 2013, to raise the income threshold to $1,000. L. 2013, c. 43, §2.

presumed to be correct and the taxpayer bears the burden of proving entitlement to farmland assessment. Hovbilt, supra, 138 N.J. at 620; Brighton v. Borough of Rumson, 22 N.J. Tax 39, 52 (Tax 2005), aff'd, 23 N.J. Tax 60 (App. Div. 2006); Miele v. Township of Jackson, 11 N.J. Tax 97, 99 (App. Div. 1989). The county board judgment on a farmland assessment matter cannot be overturned until the taxpayer has produced sufficient competent evidence "'definitive, positive, and certain in quality and quantity to overcome the presumption.'" Wyer v. Township of Middletown, 16 N.J. Tax 544, 546 (Tax 1997)(quoting Township of Bryam v. Western World, Inc., 111 N.J. 222, 235 (1988)); accord Atlantic Coast LEH, LLC v. Township of Little Egg Harbor, 26 N.J. Tax 151 (Tax 2011). It is against the backdrop of these precedents, and in light of the purpose of the Act, that the court must examine plaintiff's claims.

The municipality does not dispute that the subject property exceeds five acres. In addition, the parties are in agreement that plaintiff conducted some agricultural or horticultural activity within the meaning of the Act on the subject property, and that such activity took place on the property in the two-year period preceding tax year 2012. See N.J.S.A. 54:4-23.3.

Nor does the municipality contend that plaintiff has not met the income requirements of the statute for tax year 2012. Although the court would reach the conclusion that plaintiff has not established by a preponderance of the evidence that the statutory income requirement was satisfied, the court acknowledges that the tax assessor's denial of farmland assessment for tax year 2012 was based on her determination that the dominant use of the subject property was other than agricultural or horticultural.

It is the multiple uses of the property that will determine the outcome here. Several precedents guide the court in its application of the Act. "[W]here the entire parcel seeking farmland assessment qualification also was used for other purposes" the court must determine if

18

the agricultural or horticultural use is the dominant use of the property.  Township of Wantage v. Rivlin Corp., 23 N.J. Tax 441, 446 (Tax 2007).  If the dominant use of the property is a use other than an agricultural or horticultural use, the property is not entitled to farmland assessment.

The dominant use test was first applied by then-Judge Handler in City of East Orange v. Township of Livingston, 102 N.J. Super. 512 (Law Div. 1968), aff'd, 54 N.J. 96 (1969).  In that case, East Orange sought farmland assessment for approximately 2,500 acres it owned in three municipalities.  Id. at 518.  The land had been acquired by deed and condemnation for the purpose of collecting and protecting a supply of potable water for the inhabitants of East Orange.  The land was mostly vacant, partially heavily wooded, and had numerous low meadows traversed by brooks and streams.  Id. at 524.  The city collected potable water through a series of wells located over natural underground storage areas for rain water that percolated and infiltrated through the soil across the thousands of acres that constitutes the city's water reserve.  Id. at 523.  There was no reservoir or man-made water storage facility on the property.  Water was pumped from the property to reservoirs located on other parcels.  Id. at 524.

The city used the land for water collection and storage purposes for more than sixty years before it applied for farmland assessment of the land.  Id. at 522.  The city's farmland assessment application was based on its contention that a large portion of the property was woodlands, "permanent pasture," and "farm acreage" associated with several former farmhouses on the property which were occupied by city employees.  Id. at 524.  The city derived annual income in excess of the statutory minimum from the sale of hay, timber and cordwood grown on the property.  Id. at 526.  In 1965, income to the city from the sale of timber from the property exceeded $24,000.  Id. at 528-29.

The question before the court was whether the city's property should be taxed pursuant to N.J.S.A. 54:4-3.3, which applies to municipal-owned land "used for the purpose and for the protection of a public water supply," and which allows the lands to be taxed "in the same manner and to the same extent as the lands of private persons," or the farmland assessment statutes. Judge Handler concluded that the dominate use of the city's land controlled its status under the local property tax laws. East Orange, supra, 102 N.J. Super. at 529. He concluded that the protection of a public water supply dominated over the "merely incidental" agricultural and horticultural uses to which the city put the property. Ibid. As the court explained,

> [e]ven though the agricultural use is "active" in the literal sense that East Orange has realized income in excess of $500 per annum for the past two years from the sale of timber, cordwood and hay, compliance with this single criterion does not per se render the Water reserve as land "devoted" to agricultural use.
>
> [Id. at 536 (citation omitted).]

Noting that there can be multiple, simultaneous uses of property, the court held that "[d]epending upon the particular lands involved, one use tends to become dominant." Id. at 537. The court held that because harvesting crops and managing forests on the property supported the recharge and replenishment of the wells, "the agricultural uses of the Water Reserve must be regarded as subservient to its dominant use as a public water supply." Ibid. "In no sense, therefore, can it be said that the East Orange Water Reserve is devoted, that is, committed, or dedicated, or set apart or appropriated, or given up wholly or chiefly to the production for sale of agricultural products of any kind within the meaning" of the Act. Ibid. Instead, the land "is devoted to the purpose for which it was originally acquired," the protection of a public water supply. Ibid.[4]

---

[4] Because the holding in East Orange was affirmed by the Supreme Court, the suggestion in Urban Farms, supra, that the agricultural or horticultural use must be exclusive to qualify for farmland

This court applied the dominate use test in Green Pond Corp. v. Township of Rockaway, 2 N.J. Tax 273 (Tax 1981), aff'd, 4 N.J. Tax 534 (App. Div. 1982). There, the property owners purchased undeveloped woodland adjacent to a private residential lake community which they owned and managed. The land was used both for hiking, picnicking and other recreational pursuits by the residents of the community and for the production of woodland products. Id. at 288-291. The court held that the dominate use of the property was as a component of the residential community and not an agricultural or horticultural use. Id. at 291. The court held that the recreational use of the property "is consistent with the nature of the entire . . . tract as a residential community and the existence of the plaintiff corporations to manage that community for the benefit of its residents." Ibid.

Importantly, the court considered the fact that the agricultural activity was chiefly designed to satisfy the farmland assessment statutes. As Judge Andrew explained:

> The two corporations were formed in 1921 to manage a private residential lake community. Some 50 years later 555 acres of undeveloped woodland were acquired. In the years since then activities were undertaken aimed at producing sufficient agricultural income to satisfy the Farmland Assessment Act. This is particularly evident in the agreement with Donatoni Brothers, Inc., in which that corporation was committed to purchase a certain dollar value of timber just over the statutory minimum for property of this size. Although that fact of itself does not deny a bona fide agricultural use, taken together with the other use of the property it lends credence to the conclusion that the agricultural activities were planned primarily to satisfy the statute.
>
> [Id. at 290.]

The significance of this finding was illustrated by the court:

---

assessment is not controlling. See Mt. Hope Mining Co. v. Township of Rockaway, 8 N.J. Tax 570, 579 (Tax 1986).

21

> Plaintiffs assert that the subjective intent of the owners of property regarding its use is irrelevant as long as the acreage and income requirements of the statute are satisfied. That contention must give way to the extent it conflicts with the requirement of dominant agricultural use set forth in East Orange [v, Township of Livingston].
>
> [Id. at 290-291.]

When viewed through the prism of these precedents, the trial record establishes that plaintiff failed to prove by a preponderance of the evidence that the dominate use of the subject property was agricultural or horticultural as of October 1, 2011. It is clear that plaintiff used the subject property for multiple commercial purposes in addition to farming activity.

Plaintiff concedes that Sam S. Russo, Inc. earned $500,000 from trucking soil from construction sites to the subject property, where it was dumped in a field. While plaintiff claims that the soil was intended to be used to enhance the value of the property for farming purposes, he offered no evidence to support this assertion other than his hearsay statement that "the engineer" at the construction sites told him that the soil had agricultural value. Apparently, the DEP disagreed and halted the dumping of construction soils at the subject property.

In addition, there is no doubt in the court's mind that plaintiff, in conjunction with a partner, operated a commercial car repair and restoration business on the subject property. Plaintiff effectively admitted as much when he testified that car owners seeking repair or restoration of their vehicle obtain that service in exchange for a fee at the subject property. Mr. Russo referred to "my car shop" being moved from another location to the subject property, and that the car restoration and repair equipment in a barn is "like having my own mechanics shop on the property."

Mr. Russo's attempt to characterize the car repair and restoration shop as a hobby was entirely lacking in credibility. Plaintiff admitted that a barn on the property contains eight to ten

22

car lifts, a paint spray booth, a Freon air conditioning machine, toolboxes, welders, racks, and diagnostic computers. In addition, Mr. Russo, when asked who owned this equipment, vacillated in his answers, evidencing an intent to mask the true nature of the commercial operations. Nor did the court find credible Mr. Russo's testimony that the car repair and restoration equipment was necessary for the repair of farm equipment. Plaintiff offered not a shred of evidence to corroborate this claim.

Furthermore, a corner of the subject property was used as a motocross track for plaintiff's son and other people. There is not even the remotest chance that this use of a portion of the subject property was for agricultural or horticultural purposes. It is difficult to see how "riding a bike up and down a hill," as plaintiff described it, could be an agricultural or horticultural use of property.

While the court acknowledges that the subject property was also used for agricultural or horticultural uses on the relevant valuation date, plaintiff failed to produce evidence establishing the nature and extent of those uses. There is no evidence in the record detailing the number of livestock on the subject property or the crops planted, harvested, and used on the property. Nor is there any evidence with respect to the income generate from farming activity. Although the tax assessor did not base her decision on insufficient farming income, it is necessary to consider the amount of such income when examining the dominate use of the subject property. Sam S. Russo, Inc. generated $500,000 in income from dumping construction soil on the subject property during the year in question. A comparison of that income to the income generating by farming activity is relevant to the dominate-use analysis. Atlantic Coast LEH, supra.

These findings lead to the conclusion that plaintiff has not proven by a preponderance of the evidence that the subject property was "devoted, that is, committed, or dedicated, or set apart or appropriated, or given up wholly or chiefly to" agricultural or horticultural uses for tax year

2012.  See East Orange, supra, 102 N.J. Super. at 537.  Plaintiff has not, therefore, established an entitlement to farmland assessment for tax year 2012.  The Judgment of the Ocean County Board of Taxation for tax year 2012 will be affirmed.

In light of the statutory requirement that an award of farmland assessment is predicated on a finding that the subject property is "actively devoted to agricultural or horticultural use . . . for at least the 2 successive years immediately preceding the tax year in issue," N.J.S.A. 54:4-23.2, the court's conclusion with respect to tax year 2012 precludes farmland assessment of the subject property for tax year 2013 and 2014.  Plaintiff has not established that the subject property was "actively devoted to agricultural or horticultural use" in tax year 2012.  While some farming activity took place at the subject property during that year, plaintiff failed to establish that the dominate use of the subject property was agricultural or horticultural.  The Judgments of the county board of taxation for tax year 2013 and 2014 will, therefore, be affirmed.[5]

Very truly yours,

/s/Hon. Patrick DeAlmeida, P.J.T.C.

---

[5]     The court offers no opinion with respect to the tax assessor's determination that the dominate use of the subject property returned to an agricultural or horticultural use for tax years 2013 and 2014.

24